# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| AUGUST J. LEVERT, JR. FAMILY, LLC, ET AL. | |
| | CIVIL ACTION |
| VERSUS | |
| | NO. 19-623-BAJ-EWD |
| BP AMERICA PRODUCTION COMPANY | |

*CONSOLIDATED WITH*

| | |
|---|---|
| PAUL M. LEVERT, ET AL. | CIVIL ACTION |
| VERSUS | NO. 19-852-BAJ-EWD |
| UNION TEXAS INTERNATIONAL CORPORATION, ET AL. | |

## NOTICE

Please take notice that the attached Magistrate Judge's Report has been filed with the Clerk of the U.S. District Court.

In accordance with 28 U.S.C. § 636(b)(1), you have 14 days after being served with the attached report to file written objections to the proposed findings of fact, conclusions of law, and recommendations set forth therein. Failure to file written objections to the proposed findings, conclusions and recommendations within 14 days after being served will bar you, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court.

ABSOLUTELY NO EXTENSION OF TIME SHALL BE GRANTED TO FILE WRITTEN OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT.

Signed in Baton Rouge, Louisiana, on August 26, 2021.

**ERIN WILDER-DOOMES**
**UNITED STATES MAGISTRATE JUDGE**

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **AUGUST J. LEVERT, JR. FAMILY, LLC, ET AL.** | |
| | **CIVIL ACTION** |
| **VERSUS** | |
| | **NO. 19-623-BAJ-EWD** |
| **BP AMERICA PRODUCTION COMPANY** | |

*CONSOLIDATED WITH*

| | |
|---|---|
| **PAUL M. LEVERT, ET AL.** | **CIVIL ACTION** |
| **VERSUS** | **NO. 19-852-BAJ-EWD** |
| **UNION TEXAS INTERNATIONAL CORPORATION, ET AL.** | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Before the Court is a Motion to Remand, filed in this consolidated action by Plaintiffs.[1] Defendants[2] have filed an opposition memorandum.[3] As Defendants have not met their burden of establishing by a preponderance of the evidence that the parties are of diverse citizenship, it is recommended[4] that the Motion to Remand be granted and these cases remanded to the Eighteenth Judicial District Court for the Parishes of West Baton Rouge and Iberville, respectively.

**I.   PROCEDURAL HISTORY**

This lawsuit arises out of Defendants' oil and gas exploration and production activities, including the drilling and operation of oil and gas wells on 2,150 acres of Plaintiffs' property in

---

[1] R. Doc. 22 *and see* Reply at R. Doc. 29. August J. Levert, Jr., Family, LLC ("Levert LLC"), Ronald R. Levert, Paul M. Levert, Mark W. Levert, Jr., John E. Sanford, James L. Sanford, and Campo E. Matens are collectively, "Plaintiffs". Plaintiffs are the same in the two cases.
[2] BP America Production Company ("BP"), Union Texas International Corporation, Chevron U.S.A. Inc., Key Production Company, Inc., Atlantic Richfield Company, and Nova Chemical Olefins, LLC are collectively, "Defendants." BP is the only Defendant named in No. 19-632. The other Defendants are named in No. 19-852.
[3] R. Doc. 26.
[4] "[A] motion to remand is a dispositive matter on which a magistrate judge should enter a recommendation to the district court subject to de novo review." *Davidson v. Georgia-Pacific, LLC*, 819 F.3d 758, 765 (5th Cir. 2016).

Iberville and West Baton Rouge Parishes.[5] Plaintiffs allege damage to their property over the many decades of Defendants' oil field operations, including the "spilling, leaking, discharging, and disposing of toxic and hazardous oilfield content and wastes on, in, and adjacent to Plaintiffs' property," which Defendants knew or should have known about but have not removed and/or remediated.[6]

Plaintiffs filed suit against BP in the Eighteenth Judicial District Court for the Parish of Iberville on May 28, 2019, which BP removed to this Court on September 18, 2019.[7] Plaintiffs filed suit against the other Defendants (the "Union Texas Defendants") in the Eighteenth Judicial District Court for the Parish of West Baton Rouge on July 22, 2019, which Defendants removed to this Court on December 10, 2019.[8] Both removals assert federal subject matter jurisdiction pursuant to 28 U.S.C. § 1332 (diversity).[9] In their Notices of Removal, Defendants alleged that the proceedings did not initially appear to be removable, as the Petitions alleged that Levert LLC was comprised of members who are citizens of seventeen states, including Texas and Colorado, and therefore not diverse from Defendants, some of whom are also citizens of those states.[10] Rather, it was only receipt of documents in pre-removal discovery[11] which established that the non-diverse individuals are not actually members of the LLC because they were not properly admitted as members in accordance with Levert LLC's Operating Agreements or with Louisiana law, such that complete diversity of citizenship exists.[12]

---

[5] No. 19-623, R. Doc. 1-1, pp. 6-7; No. 19-852, R. Doc. 1-1, pp. 5-6 *and see* R. Doc. 22-1, p. 2.
[6] No. 19-623, R. Doc. 1-1, pp. 9, 12; No. 19-852, R. Doc. 1-1, pp. 8, 11.
[7] No. 19-623, R. Docs. 1, 1-1.
[8] No. 19-852, R. Docs. 1, 1-1.
[9] No. 19-623, R. Doc. 1, IV-V; No. 19-852, R. Doc. 1, XII-XIII. No party premises jurisdiction on any other ground, *e.g.*, 28 U.S.C. § 1331.
[10] No. 19-623, R. Doc. 1, p. 2 *and see* R. Doc. 1-1, p. 4; No. 19-852, R. Doc. 1, pp. 2-3 *and see* R. Doc. 1-1, pp. 3-4.
[11] No. 19-623, R. Doc. 1-4; R. Doc. 19-852, R. Doc. 1-3.
[12] No. 19-623, R. Doc. 1, pp. 2-3; No. 19-852, R. Doc. 1, pp. 6-7.

The Plaintiffs' original motions to remand were terminated without prejudice to permit the parties to engage in jurisdictional discovery.[13] Plaintiffs then re-urged the instant Motions.[14] The only question before the Court is whether Defendants have sustained their burden to establish that complete diversity of citizenship exists between the parties. Because Defendants have not, remand is recommended.

**II.    LAW AND ANALYSIS**

**A.  Legal Standard on Motions to Remand**

Pursuant to 28 U.S.C. § 1332(a), this court has original jurisdiction "of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between (1) citizens of different States." "It is axiomatic that the federal courts have limited subject matter jurisdiction and cannot entertain cases unless authorized by the Constitution and legislation."[15] Indeed, "Federal courts … must presume that a suit lies outside this limited jurisdiction…."[16]

"Consistent with general principles for determining federal jurisdiction, diversity of citizenship must exist at the time the action is commenced. In cases removed from state court, "it must be shown by a preponderance of the evidence that diversity exists when the action is commenced, and also, at the time of removal."[17] The removing party bears the burden of showing

---

[13] No. 19-623, R. Doc. 18; No. 19-852, R. Doc. 15.
[14] Identical Motions to Remand were filed in each proceeding. The cases were consolidated because the Motions involve common questions of law and fact. No. 19-623, R. Docs. 20-21; No. 19-852, R. Docs. 17-18. Citations to the remand briefs are to those filed in the lead case, *i.e.*, No. 19-632, unless otherwise specified.
[15] *Coury v. Prot*, 85 F.3d 244, 248 (5th Cir. 1996).
[16] *Ashford Hospitality Finance, LP v. Wachovia Bank, N.A.*, No. 09-1240, 2010 WL 11578737, at *2 (N.D. Tex. Mar. 18, 2010), citing *Howery v. Allstate Ins. Co.*, 243 F.3d 912, 916 (5th Cir. 2001) (footnotes omitted).
[17] *Cates v. Mescherskaya*, No. 14-00729, 2014 WL 2979376, at *2 (E.D. La. July 1, 2014). *See also, McNutt v. Gen. Motors Acceptance Corp. of Indiana*, 298 U.S. 178, 189 (1936) (establishing preponderance of the evidence standard).

3

that federal jurisdiction exists, and that removal was proper.[18] "Any ambiguities are construed against removal because the removal statute should be strictly construed in favor of remand."[19]

### B. Background

With respect to the amount in controversy, Plaintiffs' allegations of oil spills and leaks over decades, which caused contamination and the (potential) need for restoration and remediation of over two thousand acres of property in two parishes, indicate that Plaintiffs' damages are likely to exceed $75,000, exclusive of interest and costs, in each case.[20] For citizenship, the pleadings sufficiently allege the Louisiana and Oklahoma citizenships of the individual Plaintiffs,[21] and sufficiently allege that Defendants are citizens of Texas, California, Colorado, Delaware, and Pennsylvania.[22] The point of contention is the citizenship of the members of Plaintiff Levert LLC.[23] Plaintiffs claim Levert LLC has Texas, California, and Colorado citizens as members.[24] If any of the members of Levert LLC were citizens of Texas when this suit was filed or at removal, then complete diversity does not exist and both cases must be remanded. Additionally, if any of the members of Levert LLC were citizens of California and Colorado (but not Texas) when this suit was filed or removed, then the Union Texas matter must be remanded.

---

[18] *De Aguilar v. Boeing Co.*, 47 F.3d 1404, 1408 (5th Cir. 1995).
[19] *Manguno v. Prudential Prop. And Cas. Ins. Co.*, 276 F.3d 720, 723 (5th Cir. 2002), *citing Acuna v. Brown & Root, Inc.*, 200 F.3d 335, 339 (5th Cir. 2000).
[20] No. 19-623, R. Doc. 1-1, pp. 20-22 (damages and jury demand); No. 19-852, R. Doc. 1-1, pp. 19-21 (same). There is no dispute regarding the amount in controversy.
[21] There is no dispute over the citizenship of any party other than Levert LLC. No. 19-623, R. Doc. 1-1, pp. 4-5 and No. 19-852, R. Doc. 1-1, pp. 3-4 identifying Ronald R. Levert as a citizen of Oklahoma, and Paul M. Levert, Mark W. Levert, Jr., John E. Sanford, James L. Sandford, and Campo E. Matens as citizens of Louisiana. *See also* No. 19-623 at R. Doc. 1, pp. 8-9 and No. 19-852 at R. Doc. 1, pp. 4-5 (alleging same).
[22] No. 19-623, R. Doc. 1, p. 9, identifying BP as a Delaware corporation with its principal place of business in Texas and No. 19-852, R. Doc. 1, pp. 9-10 identifying: Union Texas (which is alleged to have "withdr[awn] from conducting business in 1986") as a Delaware corporation with its principal place of business in Texas; Chevron USA, Inc. as a Pennsylvania corporation with its principal place of business in California; Key Production Company as a Delaware corporation with its principal place of business in Colorado; and Nova Chemicals Olefins, LLC as having one member, Nova Chemicals, Inc., which is a Delaware corporation with its principal place of business in Pennsylvania.
[23] The citizenship of a limited liability company is determined by the citizenship of its members. *Harvey v. Grey Wolf Drilling Co.*, 542 F.3d 1077, 1080 (5th Cir. 2008).
[24] R. Doc. 26-4, p. 6; R. Doc. 26-3, pp. 4-5.

1. **Discovery Regarding Levert LLC**

According to Plaintiffs, through the Affidavit[25] and corporate deposition of Paul M. Levert ("Paul"), the "Administrative Member" of Levert LLC, the limited liability company was created as a result of the difficulties the Levert family had in managing the oil, gas, timber, and hunting activity on the family property because "dozens of people" owned small interests, and the approval of each had to be separately secured to effect changes in the operation and ownership of the property. The heirs voted to form a limited liability company to manage the property and retained an attorney in 1996, who formed Levert LLC under Louisiana law.[26]

Plaintiffs identified six members of Levert LLC whom they contend are citizens of Texas and were properly admitted under the governing documents, *i.e.*, Richard L. Bird, D. Michael Mooney, Mary Francis L. Dragoset, Rachel Robertson, Elizabeth Blanchard Lewis, and Amy Whitesell;[27] two members who are citizens of California and were properly admitted, *i.e.*, Carol Hebrard Hall and Helen Irene L. Arnold; and one member who is a citizen of Colorado and was properly admitted, *i.e.*, Catherine Levert McKinnon (collectively, "the Disputed Members").[28] In support of these citizenship assertions, Plaintiffs ultimately produced the following documents[29] of Levert LLC: the original 1997 Articles of Organization and first Initial Report and Schedule

---

[25] There are two Affidavits by Paul in the record, dated October 16, 2019 and December 23, 2019, respectively. *See* R. Doc. 22-2 (and R. Doc. 26-17) and R. Doc. 26-16. While Plaintiffs formerly relied upon the October 2019 Affidavit in connection with the original Motion to Remand in the BP matter, they do not rely upon the October 2019 Affidavit in connection with the instant Motion. Defendants have not moved to strike either affidavit.
[26] R. Doc. 22-2, p. 2 and *see* R. Doc. 22-1, p. 2.
[27] R. Doc. 1-4, pp. 3-4 (Plaintiffs' responses to BP's discovery requests) and R. Doc. 22-3, pp. 7-8 (Levert LLC's responses to Chevron's discovery requests). Paul identified Plaintiffs' responses to Chevron's discovery requests during his deposition at R. Doc. 22-6, p. 9. Plaintiffs aver that their discovery responses inadvertently failed to identify a seventh Texas member, John W. Faulk. R. Doc. 22-1, p. 6.
[28] R. Doc. 22-1, p. 6; R. Doc. 1-4, pp. 2-3 (Plaintiff's Responses to BP's discovery requests); and R. Doc. 26-3, p .3 (Levert's Responses to Chevron's discovery requests). Plaintiff objected to providing any information as to any members who are not from Texas, Delaware, California, Colorado, or Pennsylvania. *Id.*
[29] *See* R. Doc. 26-3, pp. 3-4. It is unclear which documents were produced prior to removal and which were produced post-removal, but assuming the same exhibit letters were retained, it appears that most were produced prior to the removal of the BP matter. *See* R. Doc. 22-1, pp. 6-7 and R. Doc. 1-4 (responses to BP's discovery requests with 3,013 documents attached, which are presumably duplicative of the ones attached to the instant Motion).

A;[30] the October 7, 1996 draft Operating Agreement ("Draft Operating Agreement") and Exhibit A;[31] the revised January 28, 1998 Operating Agreement ("1998 Operating Agreement");[32] and the August 28, 2011 Amended and Restated Operating Agreement ("2011 Operating Agreement"), which was executed by the managers.[33] Plaintiffs also produced several years of K-1's[34] and membership lists,[35] contribution of capital forms, what Plaintiffs contend are acknowledgments of the terms of the Operating Agreement executed by some members,[36] and check registers showing membership distributions.[37]

Within thirty days of Plaintiffs' production, BP removed the case against it, contending that the list of eight individuals on Schedule A accompanying the 1997 Articles of Organization were the original eight members of Levert LLC, all of whom have Louisiana addresses, and that the only current members are the managers who signed the 2011 Operating Agreement, all of

---

[30] R. Doc. 22-2, p. 3 *citing* R. Doc. 22-2, pp. 12-17, which is dated January 1997. However, *see* the June 16, 1997-dated version attached to Defendants' opposition memorandum, which appears to have been obtained from the Louisiana Secretary of State's office and which Paul was questioned about during his September 23, 2020 deposition. R. Doc. 22-6, p. 7 identifying R. Doc. 26-5. Aside from a difference in the dates and in one of the executing witnesses, the two documents appear to be the same.

[31] R. Doc. 22-1, pp. 2-3 *citing* R. Doc. 22-2, pp. 18-56 *and see* p. 19 (organized under Louisiana law and referencing Exhibit A as list of members) and pp. 48-53 (Exhibit A).

[32] Plaintiffs' memorandum claims that handwritten changes were made to the Draft Operating Agreement resulting in the 1998 Operating Agreement at R. Doc. 22-1, p. 3; however, the 1998 Operating Agreement is different from the Draft Operating Agreement. (*Compare* R. Doc. 22-2, pp. 18-56 with R. Doc. 22-2, pp. 61-83). Paul avers that minor changes were handwritten on the LLC's original January 1997 Operating Agreement, which resulted in the 1998 Operating Agreement. R. Doc. 22-2, p. 3, *citing* R. Doc. 22-2, pp. 61-89. Paul also testified that the original 1997 Operating Agreement is the one bearing the "Revised 1-27-1998" notation. R. Doc. 22-6, pp. 7-8 *citing* R. Doc. 26-6, pp. 1-29 (which appears to be the same 1997 Operating Agreement as the one attached to Paul's Affidavit at R. Doc. 22-2, pp. 61-89, and the Bates labels are the same). In any case, the Agreement bearing the "Revised 1-27-1998" notation is referred to as the "1998 Operating Agreement" herein.

[33] R. Doc. 22-2, p. 5 *citing* R. Doc. 22-2, pp. 90-111. *See also* R. Doc. 22-6, p. 17 identifying the 2011 Operating Agreement at R. Doc. 26-15, pp. 1-21 (which appears to be the same as the one attached to Paul's Affidavit at R. Doc. 22-2, pp. 90-111, and the Bates labels are the same).

[34] R. Doc. 22-2, p. 6 (Affidavit) and R. Docs. 22-4 and 22-5, pp. 1-117 (K-1s).

[35] R. Doc. 22-2, p. 5 (Affidavit) and R. Doc. 22-2, pp. 117-123; R. Doc. 22-3, pp. 1-95.

[36] R. Doc. 22-2, pp. 4-5, 8 (Affidavit) and R. Doc. 22-2, pp. 112-23 (Elizabeth B. Lewis ("Lewis") contribution and alleged acknowledgement); R. Doc. 22-5, pp. 132-35 (Mary Frances Dragoset ("Dragoset") contribution and alleged acknowledgement).

[37] R. Doc. 22-2 p. 7 (Affidavit) and R. Doc. 22-5 at pp. 118-38. Plaintiffs also produced "a draft list of 'Levert Consents' which shows the list and consent of new members" to Levert LLC and a "[a] listing, with 'LLC Ownership' percentages of distributions to be made in 1998." R. Doc. 22-2, p. 3 and R. Doc. 22-2, pp. 57-60.

whom are alleged to be Louisiana citizens.[38] BP alleged: "Plaintiffs did not produce a single business record that showed any Texas citizens were admitted as members into LLC in accordance with either the LLC's Original or Amending Operating Agreements or Louisiana law," including production of written ballots or resolutions evidencing the required vote.[39] The Union Texas Defendants removed on the same basis.[40] Like BP, the Union Texas Defendants contended: "Plaintiffs have not presented any evidence, such as a ballot or resolution, that any Texas, Delaware, California, Colorado or Pennsylvania citizens were admitted into the LLC by vote or that any of those citizens agreed in writing to comply with all terms and conditions of the LLC's operating agreements after being admitted by vote. Whether under the operating agreement or state law, the Plaintiffs have not admitted a Texas, Delaware, California, Colorado or Pennsylvania citizen into the LLC. Consequently, the various non-Louisiana citizens identified by the Plaintiffs are not members of the LLC, and, for the purposes of determining subject-matter jurisdiction, the LLC is not a Texas, Delaware, California, Colorado or Pennsylvania citizen."[41]

### 2. Louisiana LLC Law and the Terms of the Operating Agreements

The Articles of Organization and written Operating Agreements at issue contain provisions that directly address the addition of members; therefore, those provisions control.[42] With respect

---

[38] No. 19-623 at R. Doc. 1, pp. 2-4 *citing* R. Doc. 1-4, pp. 7-10 (alleged original members) and R. Doc. 1, p. 7, n. 8 ("BP avers that the seven Managers identified in the June 1, 2011 Operating Agreement and who are 'referred to sometimes as the 'Members'' are the only members of the LLC for purposes of diversity jurisdiction analysis.").
[39] No. 19-623, R. Doc. 1, pp. 2-3.
[40] No. 19-852 at R. Doc. 1, p. 6 *citing* R. Doc. 1-2, pp. 3-6 (alleged original members) and R. Doc. 1, pp. 5-6 *citing* R. Doc. 1-4, pp. 44-45 (alleged current members). *See* R. Doc 1, p. 6, n. 2 ("Defendants aver that the seven Managers identified in the June 1, 2011 Operating Agreement and who are 'referred to sometimes as the 'Members'' are the only members of the LLC for purposes of diversity jurisdiction analysis.").
[41] No. 19-852, R. Doc. 1, pp. 8-9.
[42] La. R.S. § 12:1332 requires unanimous written consent of the other members for an assignee of an interest in a limited liability company to become a member "[e]xcept as otherwise provided in the articles of organization or a written operating agreement."

7

to transfers of a membership interest, Article X, "Assignment of Interest" of the 1998 Operating Agreement[43] provides, in relevant part, as follows:

> 10.1 Compliance With This Article Required. Any Person acquiring an interest in the L.L.C. by bequest or inheritance or by a transfer permitted pursuant to this Article shall not become a substituted Member unless and until the conditions of this Article have been complied with. The death, interdiction, dissolution, seizure of an interest in the L.L.C. , or bankruptcy of a Member shall not result in a cessation of his interest in the L.L.C. and shall not effectuate an assignment of his interest to his successor in interest unless and until the conditions of this Article have been complied with.
>
> 10.2 Consent of Members. In the event one of the Members desires to sell or otherwise assign his interest in the L.L.C. (except by operation of law), **he must obtain the prior written approval of a simple majority of the total ownership interest of the Members**, which consent the other Members may, in their sole discretion, withhold for any reason and comply with all other provisions of this Article. In the event that the selling Member does not obtain the approval of a majority of the other Members for the sale or assignment as is provided in this paragraph, the assignee of such interest shall not become a substituted Member under this agreement, shall have no right to participate in the management of the business and affairs of the L.L.C., shall have no right to ownership of membership interest on the L.L.C.'s books and records, and the L.L.C. and the Members shall have no obligation whatsoever to such assignee.
>
> ***
>
> 10.4 Permitted Assignment. Provided the requirements of this Article are met, the assignee of the Member may be admitted to the L.L.C. Upon the death of a Member, his heir, legal representative, or succession may be substituted for such deceased Member upon compliance with the provisions of this Operating Agreement **including the requirement of the simple majority vote of the total ownership interest provided in paragraph 10.2 above**.
>
> 10.5 Agreement to Comply. Any person admitted to the L.L.C. as a new Member or as a substituted Member shall be subject to and must

---

[43] Although it is unsigned, Defendants rely on the requirements for admission of members in the 1998 Operating Agreement (which they refer to as the "Original Operating Agreement" in their opposition memorandum). R. Doc. 26, pp. 3-5 *citing* R. Doc. 1-4 of No. 19-852, pp. 1-23 (also at R. Doc. 22-2, p. 61, *et. seq.*). Defendants also questioned Paul about the agreement, including its requirements regarding new members. R. Doc. 26-1, pp. 28-33 and R. Doc. 26-6.

      agree in writing to comply with all terms, conditions, and provisions of these Articles.[44]

With respect to Levert LLC's procedure for adding Levert property owners who contribute their property into the LLC in exchange for membership, the 1998 Operating Agreement provides for a vote of only five of the seven managers:

> 10.11 **An owner of an interest in the property** described in Exhibit "B" to this agreement who is not a Member of the L.L.C. **may be admitted as a Member** upon transfer of all of his ownership interest in the property to the L.L.C., his agreement to all terms and provisions of this agreement **and the affirmative vote of five of the seven Managers of the L.L.C.** Any Member admitted in accordance with this Section shall be assigned by affirmative vote of five of the seven Managers of the L.L.C. to one of the seven (7) family classes set forth in Exhibit "A" to this agreement.[45]

Article XI, "Addition of New Member" of the 1998 Operating Agreement provides:

> 11.1 A new Member may only be added in accordance with the provisions of Article X.[46]

And Section 12.4, like Article V of the Articles of Organization,[47] provides:

> 12.4 L.L.C. Actions and Decisions. Anyone dealing with the L.L.C. may rely on a certificate of one of the Managers authorized in the Articles of Organization as to: (1) the identity of any Member; (2) the existence or nonexistence of any consents, approvals or other facts or circumstances that constitute conditions precedent to acts by the L.L.C. or are otherwise germane to the affairs of the L.L.C.; (3) the identity of Persons who are authorized to execute and deliver any instrument or document for the L.L.C.; (4) the ownership of interests in the L.L.C.; (5) the authenticity of any records of the L.L.C.; and (6) any other facts or circumstances relating to the L.L.C. or its affairs.[48]

---

[44] R. Doc. 22-2, pp. 69-70 (emphasis added). The Draft Operating Agreement also contains these provisions. R. Doc. 22-2, pp. 28-29.
[45] R. Doc. 22-2, p. 72 (emphasis added). This provision is not in the Draft Operating Agreement.
[46] R. Doc. 22, p. 72. *See also* the Draft Operating Agreement at R. Doc. 22-2, p. 32.
[47] Article V of the Articles provides: "Any manager may certify documents on behalf of the L.L.C. indicating the following: a) The membership of any member." R. Doc. 26-5, p. 3.
[48] R. Doc. 22-2, p. 73.

9

Thus, under Section 10.11 of the 1998 Operating Agreement, only a majority vote of the managers was required for a current property owner to be admitted into membership. In contrast, under Section 10.4, a simple majority vote of the membership interest was required for assignees and transferees who were not property owners to be admitted into membership.

The adoption of the 2011 Operating Agreement eliminated this distinction by requiring written approval of five of the seven managers for any transfers of membership interests:

> 10.2 Consent of Members. In the event one of the Members desires to sell or otherwise assign his interest in the L.L.C. (except by operation of law, **he must obtain the prior written approval of at least five (5) of the seven (7) Managers of the L.L.C.,** which consent may, in their sole discretion, be withheld for any reason and comply with all other provisions of this Article. In the event that the selling Member does not obtain the required approval for the sale or assignment as is provided in this paragraph, the assignee of such interest shall not become a substituted Member under this Agreement, shall have no right to participate in the management of the business and affairs of the L.L.C., shall have no right to ownership of members interest on the L.L.C.'s books and records, and the L.L.C. and the Members shall have no obligation whatsoever to such assignee.[49]

The 2011 Operating Agreement also contains the same Section 12.4, *i.e.*, anyone dealing with the LLC may rely on a manager certification as to the identity of any member.[50]

### 3. Paul's Certification, Affidavit, and Testimony

Post-removal, Paul executed a December 23, 2019 "Certification" pursuant to Section 12.4 of the 2011 Operating Agreement, certifying that the Disputed Members are members of Levert LLC and have been members since at least 2011.[51] That same day, Paul executed an Affidavit, identifying the documents produced and attesting, among other things, as follows: Paul generally ensured that the Operating Agreements' required procedures for the transfer of membership

---

[49] R. Doc. 22-2, p. 97.
[50] R. Doc. 22-2, p. 102.
[51] R. Doc. 22-5, pp. 136-38.

10

interests and the addition of new members pursuant to Articles X and XI were abided by; Paul sent letters to the LLC members seeking their votes regarding the addition of new members and the transfer of membership interests; Paul mailed acknowledgment forms to the new members to sign and mail back; the membership lists accurately reflect the LLC's membership; Paul maintains the LLC's files and they are not comprehensive; the Disputed Members were "properly admitted under the provisions of Article X of the Operating Agreement" and are currently members of the LLC as reflected by the membership lists, bank records, and tax records; and although Paul did not have all documents, he was "confident we properly followed the required vote and acknowledgement procedures for admission" of the Disputed Members.[52]

During the ninety-day discovery period ordered by the Court, Paul was deposed as the corporate representative of Levert LLC regarding the LLC documents and each of the Disputed Members.[53] Paul testified that: for a new member or a substitute member to be admitted into the LLC, there first had to be written approval of the majority of the membership interest;[54] newly admitted members had to sign a document agreeing to comply with the terms of the Operating

---

[52] R. Doc. 22-2, pp. 3-8.
[53] R. Doc. 22-6, pp. 9-17.  Defendants also propounded a second set of discovery requests to Plaintiffs, to which Plaintiffs apparently responded with several hundred more documents "regarding citizenship of LLC members." R. Doc. 26-4 and *see* p. 9.  It is not clear what is contained within that production, but it appears from the exhibits attached to Paul's deposition that some of the documents are legal papers conveying membership interests, such as judgments of possession.  *See, e.g.,* R. Docs. 26-9 and 26-11.
[54] As Plaintiffs point out at R. Doc. 29, pp. 4-5, Paul misstated that a majority vote of the membership interest was required for admission of all new members in all cases. *See* R. Doc. 22-6, pp. 8-9 (After confirming the language of Section 10.11, Paul testified: "Q: So is it fair to say that for a new member or a substitute member to be admitted into the LLC, there first had to be written approval of the majority of the members?", Paul answered "Yes," but that conflicts with the language of Section 10.11 in the 1998 Operating Agreement and with Section 10.2 of the 2011 Operating Agreement. R. Doc. 22-2, p. 72.  In fact, the 1998 Operating Agreement calls for a majority vote of managers for the admission of current owners, and the 2011 Operating Agreement calls for a majority vote of managers as to all new members. R. Doc. 29, p. 4, *citing* Paul's testimony at R. Doc. 22-6, pp. 7-9 referencing Exhibit 7 to the deposition, which is the 1998 Operating Agreement at R. Doc. 22-2, p. 72.  Even so, Paul's legal interpretation of the Agreement's language is not controlling, as he is a lay witness, and the terms of the documents speak for themselves. *See, e.g., In re ProvideRx of Grapevine, LLC,* 507 B.R. 132, 144 (Bankr. N.D. Tex. 2014) ("A lay witness may not give an opinion that requires "scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701(c). It is also generally prohibited for a lay witness to interpret statutes and to give legal opinions.") (citations omitted).

11

Agreement per Articles X and XI;[55] Levert LLC had produced all documents that Plaintiffs contended proved the Disputed Members were members of the LLC;[56] and, there was no documentation showing that a majority of the members voted to admit any of the Disputed Members.[57] However, Paul also testified that votes were taken "on everything" and "on everyone,"[58] including on the admission of new members, and that he received ballots back from the members which were always "yes" votes. He also testified that at least some votes were received for each of the Disputed Members.[59]

### C. Defendants Have Not Shown by a Preponderance of the Evidence that the Parties are Diverse

Defendants, as the removing parties, have the burden of establishing that this Court has subject matter jurisdiction. To remove a case based on diversity jurisdiction, a defendant must demonstrate "that all of the prerequisites of diversity jurisdiction contained in 28 U.S.C. § 1332 are satisfied." Thus, the removing defendant must establish that the amount in controversy exceeds $75,000 and that the parties are diverse in citizenship.[60] Plaintiffs misconstrue the correct legal standard by which Defendants must sustain their overall burden to prove that complete diversity of citizenship exists, which is a preponderance of the evidence.[61] "A preponderance of the

---

[55] R. Doc. 22-6, pp. 9, 41, clarifying that the vote required was a majority of the membership interest. There are signed and notarized acknowledgments by two of the Disputed Members, acknowledging that the Operating Agreement was effective. *See* R. Doc. 22-2, p. 113 (Lewis) and R. Doc. 22-5, p. 135 (Dragoset).
[56] R. Doc. 22-6, p. 6.
[57] R. Doc. 22-6, pp. 10-15.
[58] To the extent there was one response where Paul testified that he had no evidence that a vote occurred to admit Disputed Member Carol Hall, *see* R. Doc. 22-6, p. 12, he corrected that response later when counsel raised the issue for confirmation. Paul clarified that "a vote occurred on everything. Every member, votes were sent out…." R. Doc. 22-6, p. 15.
[59] R. Doc. 22-6, pp. 16, 18.
[60] *Turpin v. Cooper Tire & Rubber Co.,* No. 12-02007, 2012 WL 4758113, at *2 (W.D. La. Oct. 5, 2012), *report and recommendation adopted,* No. 12-2007, 2012 WL 6705816 (W.D. La. Dec. 21, 2012) (citations omitted).
[61] *Cates*, 2014 WL 2979376, at *2. *See also, McNutt*, 298 U.S. 178, 189. The "unequivocally clear and convincing" standard of 28 U.S.C. § 1446(b)(3), which Plaintiffs argue applies, arises when there is a dispute about the *timeliness* of removal. To the extent Plaintiff asserts that the removals were untimely (on grounds that are somewhat confusing), such arguments fail. *See* R. Doc. 22-1, pp. 13, 15-16, 28-29. At the time of removal, Defendants facially alleged that the parties were diverse based on "other paper" in the form of Plaintiffs' discovery responses and document production (which Plaintiffs have successfully challenged on remand). However, no evidence has been presented that is "unequivocally clear and certain" evidence of diversity that ever started the removal clock. Thus, the removals were

12

evidence is ... [e]vidence which is ... more convincing than the evidence ... offered in opposition to it ..."[62] In other words, Defendants must prove that it is more likely than not that diversity exists. Regardless, Defendants have not met even the lower standard because they cannot identify and establish the citizenship of the members of Levert LLC by a preponderance of the evidence.[63]

### 1. Defendants Have Not Shown that the Individuals Listed on the 2011 Operating Agreement are the Only Current Levert LLC Members

In their Notices of Removal, Defendants state that the "seven Managers identified on the June 1, 2011 Operating Agreement … are the only members of the LLC for purposes of diversity jurisdiction analysis."[64] Defendants rely on the preamble to the 2011 Operating Agreement for their contention that the seven managers, the only signatories,[65] are the only current members of Levert LLC:[66]

> BE IT KNOWN that this Operating Agreement for Levert Family, L.LC., a limited liability company ("L.L.C."), effective as of June 1, 2011, **is entered into by, between and among the Managers,**

---

not untimely. *See Chandler v. Ruston Louisiana Hosp. Co. LLC,* No. 3:14-121, 2014 WL 1096365, at *6 (W.D. La. Mar. 19, 2014) ("The 'unequivocally clear and certain' standard is applied when a court is determining whether a defendant has timely removed, not whether removal was permissive. Stated differently, the Section 1446(b)(3) 30–day clock acts as a ceiling or limit on removal, not as a jurisdictional floor. As one court put it, Section 1446 'does not say anything about removals that occur too soon.' *Robinson v. Quality Ins. Co.,* 633 F.Supp. 572, 576 (S.D. Ala. 1986). If, before the 30–day clock starts, a defendant can demonstrate by a preponderance of the evidence that the jurisdictional threshold is met, he or she may remove without being required to 'unlock' the 30–day window by presenting 'unequivocally clear and certain' evidence.").

[62] *Metropolitan Stevedore Co. v. Rambo*, 521 U.S. 121, 137 (1997), *citing Greenwich Collieries v. Director, Office of Workers' Compensation Programs,* 990 F.2d 730, 736 (3rd Cir. 1993) (internal quotation marks omitted)), *aff'd*, 512 U.S. 267 (1994).

[63] *Harvey*, 542 F.3d at 1080 (for purposes of diversity, "the citizenship of a limited liability company is determined by the citizenship of all of its members."). To properly allege the citizenship of a limited liability company, a party must identify each of the members of a limited liability company, and the citizenship of each member in accordance with the requirements of 28 U.S.C. § 1332(a) and (c). *PCS Nitrogen Fertilizer, L.P. v. Providence Eng'g & Envt Grp., LLC*, No. 20-856, 2020 WL 7646381, at *1 (M.D. La. Dec. 23, 2020).

[64] R. Doc. 1, p. 7, n. 8; No. 19-852, R. Doc. 1, p. 6, n. 2. No party disputes that the seven Managers on the 2011 Operating Agreement are Louisiana citizens.

[65] *See* signatories at R. Doc. 22-2, pp. 110-11 (Paul, Mark Levert, Campo E. Matens, Matt McConnell, Mark Deboiser, William Luikart, and S. Scott Soileau). Paul testified that the seven managers represent the seven branches of the Levert family tree. R. Doc. 22-6, p. 3.

[66] R. Doc. 26, pp. 5, 11-12. It is not clear whether Defendants are alleging in the remand briefing that the signatories to the 2011 Operating Agreement are the only members, or are members in addition to those whom they claim were the original members because they were listed on the Schedule A to the Initial Report accompanying the 1997 Articles of Organization. However, the Notices of Removal clearly assert that the only current members of the LLC are the Managers as set out in the 2011 Operating Agreement. For that reason, Defendants' argument regarding the alleged original members listed on Schedule A to the Initial Report is not considered.

> **comprising the seven membership classes identified on Exhibit "A" of this Operating Agreement, referred to sometimes as the "Members",** who in accordance with Article XII, and the unanimous consent and vote of **the seven (7) Managers of the L.L.C., as evidenced by their signatures to this Agreement,** declare, stipulate and agree to this amendment to and restatement of the L.L.C.'s Operating Agreement dated October 7, 1996, as follows:…[67]

This language does not support Defendants' position that the managers who signed the document are the only members; rather, the cited language states that the seven managers comprise the seven membership classes. It is those seven membership classes that are sometimes referred to as "Members." Several other provisions of the 2011 Operating Agreement also refute Defendant's argument. *See* Section 12.1, which explains that many members are divided into seven classes who each elect one Manager;[68] Section 1.1: "The Members agree that all rights and responsibility of administration and management of the L.L.C. under Louisiana law shall be vested in elected Managers subject to the restrictions on their management authority expressed later in this Agreement;"[69] Section 3.11: "'Member' 'means any Person who has been admitted as a Member (including the initial Members) or substituted Members pursuant to the terms of this Agreement. 'Members' means all such Persons."[70] These sections contemplate that persons other than managers are members.

As Defendants have not established that the members of Levert LLC are only the seven managers who signed the 2011 Operating Agreement, it must be determined whether other evidence in the record is sufficient to meet Defendants' burden of establishing that the members of the LLC are diverse.

---

[67] R. Doc. 22-2, p. 91 (emphasis added). There is no Exhibit "A" attached to the 2011 Operating Agreement that lists the members or membership classes.
[68] Plaintiffs' Memorandum at R. Doc. 22-1, pp. 26-27, *citing* R. Doc. 22-2, pp. 100-01 *and see* p. 104 (member elections for the replacement of managers).
[69] R. Doc. 22-2, p. 91.
[70] *Id.* at p. 93.

14

## 2. Defendants Have Not Established the Members of Levert LLC

Plaintiffs have consistently alleged that the Disputed Members are members of the LLC and have produced corroborating information to show that these individuals have been treated as members for years, including Paul's testimony and Certification as the Administrative Member, that these individuals are members, and the documents showing membership lists, distributions of interests and taxation of same.[71] The Operating Agreements also provide that third parties may rely on Paul's Certification as to the identity of the members.[72] To counter this, in addition to Defendants' arguments, rejected above, about the interpretation of the 2011 Operating Agreement, Defendants also argue that Plaintiffs cannot establish that the Disputed Members of the LLC are members because Plaintiffs cannot show that the requirements of the Operating Agreements were met as to each member. In support, Defendants rely heavily on Paul's deposition testimony that he is not able to conclusively state that each Disputed Member received a majority vote of the membership. This argument misses the mark because neither Operating Agreement requires a majority vote of the members to approve the admission of *every* new member and it is not clear which Operating Agreement provisions are applicable to which Disputed Members.[73]

The 1998 Operating Agreement has two different provisions for admission into the LLC—one for new members who were not already property owners and one for new members who were.[74] While the admission provision for new members who were not already property owners requires a majority vote of the members, the admission provision for property owners requires only a vote of five of the seven managers. The 2011 Operating Agreement also requires only a vote of five of the seven managers for membership. Accordingly, the repeated questioning of Paul

---

[71] R. Doc. 22-1, pp. 6-14, 17, 22-23 and Reply at R. Doc. 29, pp. 1-4.
[72] R. Doc. 22-1, pp. 23-25.
[73] While information pertinent to this inquiry may be contained in the thousands of documents produced, it has not been pointed out to the Court.
[74] R. Doc. 22-2, pp. 69; 72.

15

regarding whether he could establish that each Disputed Member received a majority vote of the membership is irrelevant because Defendants have not established which Operating Agreement would govern as to each Disputed Member and Paul was not questioned at all regarding votes Disputed Members may have received from managers.[75]

Defendants also argue that, as a prerequisite to membership, a newly admitted member must sign a document saying that he or she agrees to comply with the terms and obligations of the Operating Agreement."[76] Plaintiffs dispute that this requirement is a prerequisite to membership, although they acknowledge that newly admitted members are required to sign such a document.[77]

Section 10.5 of both Operating Agreements provides that "any person admitted to the L.L.C. as a new Member or as a substituted Member shall be subject to and must agree in writing to comply with all terms, conditions, and provisions of these Articles."[78] This language seems to suggest that the person who is required to sign a written compliance has already been admitted as a new or substituted member. At best, the Operating Agreement provisions are ambiguous. As such, extrinsic evidence of membership may be considered.[79] The extrinsic evidence presented, *i.e.*, membership lists and tax and distribution documents,[80] while not alone dispositive of the

---

[75] R. Doc. 22-1, pp. 14, 18; Reply at R. Doc. 29, pp. 4-5; R. Doc. 22-1, p. 72; R. Doc. 22-1, pp. 97-98. It is not clear which of the Disputed Members, if any, were already owners, or which members were admitted when the 2011 Operating Agreement was in effect and thus which Operating Agreement would apply. Plaintiffs contend Lewis and Dragoset contributed property that they already owned in exchange for membership, *i.e.*, were owners, which triggered a vote of the managers, not the members. *See* R. Doc. 29, p. 4-5. *See also* Paul's testimony regarding admission of Lewis and Dragoset at R. Doc. 22-6, pp. 12, 13 and their contributions of capital to Levert LLC at R. Doc. 22-2, pp. 112-16 and R. Doc. 22-5, pp. 132-35.
[76] R. Doc. 26, pp. 14-15.
[77] R. Doc. 22-1, p. 7.
[78] R. Doc. 22-2, p. 70 and R. Doc. 22-2, p. 98. The Draft Operating Agreement also contains this provision. R. Doc. 22-2, p. 29.
[79] *See Carbine v. Xalapa Farm Limited Partnership,* 980 F. Supp. 860 (E.D. La. Sept. 29, 1997) (finding that the deceased's written acts of assignment effectively conveyed intent for the assignees to become limited partners, but because the agreement's provision regarding an assignee's written consent was ambiguous, the court could look to extrinsic evidence: "Considering the numerous letters, financial statements, and other documents reflecting the Partnership's treatment of the plaintiff as not merely an 'assignee' but a partner, the Court finds that whatever additional formalities the General Partners may have deemed necessary pursuant to subsection (b) were satisfied.") *Id.* at 864.
[80] *See* Paul's Affidavit at R. 22-2, pp. 8-11 for the record references to these documents for each Disputed Member.

16

membership of the Disputed Members, shows that the LLC treated the Disputed Members as members and at least raises an ambiguity as to diversity that cannot be resolved in the context of a Motion to Remand.[81]

*Barber Bro. Contracting Co., LLC v. Hanover Ins. Co.,* heavily relied upon by Defendants, is distinguishable.[82] In *Barber*, there was no factual dispute that the requirements of the operating agreement had not been met to recognize the non-diverse party as a member of the limited liability company.[83] In contrast, there are factual disputes here, including which Operating Agreement provisions apply to each Disputed Member and whether those requirements were followed. Factual disputes are resolved in favor of remand. The other cases cited by Defendants do not indicate that contradictory evidence such as Paul's testimony was presented, or otherwise do not support Defendants' position.[84]

Defendants have failed to sustain their burden to establish by a preponderance of the evidence presented that complete diversity of citizenship existed at the time the Petitions were filed and at the time of removal. The uncertainty of which Operating Agreement provisions are applicable to which Disputed Members, whether those requirements were followed, and the

---

[81] Additionally, there are two notarized acknowledgements in the record, *to-wit*: two Texas members, Lewis and Dragoset, "acknowledge[] that this Operating Agreement is effective…." R. Doc. 22-2, p. 114 and R. Doc. 22-5, p. 135. Per Paul's Affidavit, this document, a form of which is attached to the Draft Operating Agreement, is the "acknowledgment form" by which the new members acknowledge the terms of the Operating Agreement. R. Doc. 22-2, pp. 5, 56. Paul's Affidavit references the blank form used for acknowledgements as being appended to the Articles of Organization (R. Doc. 22-2, p. 3); however, the document is appended to the Draft Operating Agreement.
[82] No. 13-105, 2013 WL 6230335 (M.D. La. Dec. 2, 2013).
[83] *Barber*, 2013 WL 6230335, at *5 ("Although Plaintiff states that 'this clause is discretionary,' it provides no factual or legal support or argument for this conclusion, despite the mandatory language of the provision.").
[84] *See, e.g., Carbine,* 980 F. Supp. 860 (written consent requirement was ambiguous, which enabled the court to look to extrinsic evidence of membership, a holding which supports Plaintiffs' position in this case). In *Labby v. Labby Memorial Enterprises, LLC*, 2019 WL 3431644 (W.D. La. June 10, 2019), the defendant limited liability company did not have an operating agreement, and the only member listed on its articles of organization attested that he never consented in writing to the disputed member becoming a member of the limited liability company. The court thus found that, by operation of Louisiana's limited liability company law, the required unanimous consent of the members was not obtained to admit the disputed member. 2019 WL 3431644, at *2. In this case, there are factual disputes regarding what was necessary to establish membership.

ambiguities in the Operating Agreements, coupled with the consistent treatment of the Disputed Members as members of the LLC for years, raise factual questions that require remand.

### D. An Award of Costs and Fees Is Not Warranted

Plaintiffs request an award of costs and fees incurred in filing the Motion to Remand pursuant to 28 U.S.C. § 1447(c), which provides, in pertinent part, that an order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal.[85]  The language of § 1447(c) is permissive and there is no automatic entitlement to an award of attorney's fees.[86] In applying this provision, courts consider "the propriety of the removing party's actions based on an objective view of the legal and factual elements in each particular case.... In other words, the question we consider in applying § 1447(c) is whether the defendant had objectively reasonable grounds to believe the removal was legally proper."[87]

An award of costs and attorney's fees is not warranted in this case.  The documents produced do not contain ballots voting in favor of admitting every Disputed Member.  This lack of information was not sufficient to sustain Defendants' burden considering the other evidence presented.  Although Defendants ultimately could not meet their burden, it cannot be said that they failed to have objectively reasonable grounds to believe that removal was legally proper.[88]  As such, Plaintiffs' request for the costs and attorney's fees incurred in filing the Motion to Remand should be denied.

---

[85] 28 U.S.C. § 1447(c); R. Doc. 22-1, pp. 29-30.
[86] *Valdes v. Wal-Mart Stores, Inc.*, 199 F.3d 290, 291 (5th Cir. 2000).
[87] *Id.* at 293.
[88] R. Doc. 26, p. 19.

**III.    CONCLUSION**

Defendants have, at most, established a factual dispute as to whether the Disputed Members of Levert LLC are members. Factual disputes are not properly resolved in deciding a motion to remand, and doubts regarding the propriety of removal require remand. Accordingly, **IT IS RECOMMENDED** that the Motion to Remand[89] be **GRANTED**, and that Civil Action No. 19-623 be **REMANDED** to the Eighteenth Judicial District Court for the Parish of Iberville and Civil Action No. 19-852 be **REMANDED** to the Eighteenth Judicial District Court for the Parish of West Baton Rouge.

Signed in Baton Rouge, Louisiana, on August 26, 2021.

*[signature]*

**ERIN WILDER-DOOMES**
**UNITED STATES MAGISTRATE JUDGE**

---

[89] R. Doc. 22.